# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 10-3423/11-1526

_____

Joe K. Smith; Jan G. Smith;          *
Burke Smith, Executor of             *
Irene Smith's Estate,                *
                                     *
          Appellees,                 *
                                     *
     v.                              *
                                     *
Arrington Oil & Gas, Inc.,           *
                                     *
          Appellant.                 *


_____

Nos. 10-3542/11-1519

_____

Winston P. Foster, Jr.;              *
Mary Ned Foster;                     *
Mary Frances Gaston,                 *
                                     *
          Appellees,                 *
                                     *
     v.                              *
                                     *
Arrington Oil & Gas, Inc.,           *
                                     *
          Appellant.                 *

Appeals from the United States
District Court for the
Eastern District of Arkansas.

Samuel P. Hall; Brenda Hall,     *
                                  *

        Appellees,          *
                                  *

    v.                     *
                                  *

Arrington Oil & Gas, Inc.,      *
                                  *

        Appellant.         *
_____

Submitted: September 22, 2011
Filed: January 5, 2012
_____

Before RILEY, Chief Judge, COLLOTON and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

In this consolidated appeal, three sets of landowners assert claims against Arrington Oil & Gas, Inc. for breach of contract, promissory estoppel, and unjust enrichment relating to Arrington's failure to pay cash bonuses under oil and gas leases. The district court[1] granted summary judgment to the landowners on the

_____

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

breach of contract claims and thereafter dismissed the landowners' other claims with prejudice on the landowners' motions. For the reasons stated below, we affirm.

## I.    BACKGROUND

Arrington is an oil and gas production company headquartered in Midland, Texas. Each landowner was a resident of Arkansas at the time the present actions were filed.[2] From January through July of 2006, Arrington's landmen presented oil and gas lease agreements to the landowners for certain properties in Phillips County, Arkansas. The lease agreements were prepared by Arrington and are substantially identical with the exception of the names of the property owners, execution dates, and property descriptions.

Each lease agreement recites an exchange in which the landowner (as lessor) grants to Arrington (as lessee) an exclusive right to explore and develop oil and gas resources on specifically described property "for and in consideration of a cash bonus in hand paid . . . and of the covenants and agreements hereinafter contained . . . ." In addition to the recitation of a cash bonus, the amount of which is not stated, the lease agreements recite in Paragraph 2 that as consideration for the lease, the lessee will pay the lessor royalties in the amount of fifteen percent of sales of oil and gas derived under the lease less certain costs of production. The lease agreements remain in force for five years from the date of execution and grant the lessee the option of extending the lease for an additional five-year term. Paragraph 13 specifically provides that the lease agreements "shall be effective as to each Lessor on execution hereof as to his or her interest." Paragraph 15 provides that the lessor "warrants and agrees to defend the title to the lands herein described." Paragraph 16 grants Arrington the

_____

[2] Samuel P. Hall and Brenda Hall are the landowners in Case Nos. 10-3785 and 11-1498. Joe K. Smith, Jan G. Smith, and Irene N. Smith are the landowners in Case Nos. 10-3423 and 11-1526. Winston P. Foster, Jr., Mary Ned Foster, and Mary Frances Gaston are the landowners in Case Nos. 10-3542 and 11-1519.

opportunity to cure any failure to perform any of its covenants under the lease after notice of the breach by the landowner. The lease agreements provide a notarized signature block for each landowner, but they do not contain a signature space for Arrington.

In each transaction, Arrington's landman delivered one or more bank drafts to the landowners in exchange for receiving the signed lease agreement. Each draft designates Arrington as the "Drawee," the landman as the "Drawer," and Western National Bank in Midland, Texas, as the "Collecting Bank." Each draft references a corresponding lease agreement by execution date and property description. The drafts were issued to pay the "cash bonus" referenced in the lease agreement and the total payment amount for drafts corresponding to any particular lease agreement was equal to $300 for each acre of property covered by the lease agreement.[3] Each draft also contains additional language providing that (emphasis added):

> On approval of lease or mineral deed described hereon, and *on approval of title to same by drawee* not later than [a stated number of] banking days after arrival of this draft at Collecting bank, with the right to Re-Draft.
> PAY TO THE ORDER OF [landowner].

After disclosing the payee name and payment amount, each draft then contains language regarding escrow of the draft, including the following exculpatory language:

> [T]here shall be no liability whatsoever on the collecting bank for refusal to return the [drafts] prior to [expiration of the escrow period printed on the draft].

---

[3]Arrington's lease files also indicate that the amount of the cash bonus was $300 per acre. Furthermore, the lease agreements themselves expressly declare in Paragraph 21 that Arrington may renew the lease for a second five-year term by paying an additional $300 per acre to the landowners.

In the event this draft is not paid within said time, the collecting bank shall return the same to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto.

Each landowner subsequently deposited the drafts he or she received in exchange for the lease agreement at a local bank. Arrington failed to make payment on the drafts and never otherwise paid the cash bonuses discussed in the lease agreements. As a result, the landowners filed the present actions. During discovery, Arrington admitted that it had no record of title disapproval for any of the lease agreements at issue. Arrington also admitted in a separate case that it decided to abandon its oil and gas leases in Phillips County on July 26, 2006, because it drilled an unproductive well there. The district court granted summary judgment for the landowners on the breach of contract claims, finding that the lease agreements were enforceable contracts subject only to Arrington's good faith disapproval of title and that there was no genuine question that Arrington decided not to pay the drafts for reasons that were unrelated to title. The landowners subsequently moved for costs and attorneys' fees pursuant to Arkansas law, and the court granted those motions as well. Arrington timely appeals.

## II.    DISCUSSION

We review the district court's grant of summary judgment *de novo*. *Taylor v. St. Louis Cnty. Bd. of Election Comm'rs*, 625 F.3d 1025, 1026 (8th Cir. 2010) (per curiam). Summary judgment is appropriate when, viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

Arrington contends that the lease agreements were not enforceable contracts because (1) the drafts' no-liability clause negated mutuality of obligation in the lease agreements, (2) Arrington never "approved" the leases in accordance with the condition stated on the bank drafts, and (3) Arrington never approved title in accordance with the condition stated on the bank drafts. The landowners counter that the lease agreements they executed before receiving the bank drafts control the agreement. They argue that the bank drafts are merely the method of payment of the cash bonuses referenced in the lease agreements and that Arrington is obligated to pay the cash bonuses under the lease agreements regardless of any terms to the contrary recited on the drafts. Thus, we must determine whether the drafts' no-liability, lease approval, or title approval clauses absolved Arrington of a legally enforceable duty to pay the cash bonuses recited in the lease agreements.

We review *de novo* the district court's "interpretation and construction of a contract, as well as a district court's interpretation of state law." *Am. Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1023 (8th Cir. 2010). Our jurisdiction in these cases is based on diversity of citizenship, and the parties agree that we are to apply Arkansas law. *See Kaufmann v. Siemens Med. Solutions USA, Inc.*, 638 F.3d 840, 843 (8th Cir. 2011). Thus, we "must attempt to predict what [the Arkansas Supreme Court] would decide if it were to address the issue." *Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872, 875 (8th Cir. 2011). In so doing, "we apply three well-established principles of contract law." *First Nat'l Bank of Crossett v. Griffin*, 832 S.W.2d 816, 819 (Ark. 1992). "[T]he primary rule in the construction of instruments is that the court must, if possible, ascertain and give effect to the intention of the parties." *Harris v. Stephens Prod. Co.*, 832 S.W.2d 837, 840 (Ark. 1992). Arkansas law requires courts to "look to the contract as a whole and the circumstances surrounding its execution to determine the intention of the parties." *Griffin*, 832 S.W.2d at 820. Second, in construing any contract, Arkansas courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning." *Id.* at 819 (quoting *Farm Bureau Mut. Ins. Co. of Ark. v. Milburn*, 607

S.W.2d 841, 842 (Ark. 1980)).  Third, "different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible."  *Id.* (quoting *Cont'l Cas. Co. v. Davidson*, 463 S.W.2d 652, 655 (Ark. 1971).  "A construction that neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions."  *Tyson Foods, Inc. v. Archer*, 147 S.W.3d 681, 686 (Ark. 2004).  Applying these principles, we hold that the lease agreements required Arrington to pay the cash bonuses unless Arrington disapproved of title in good faith within the time prescribed on the face of each bank draft.

We begin by rejecting the landowners' assertion that the lease agreements can be construed without considering the language of the bank drafts.  Under Arkansas contract law, multiple documents executed as part of a single transaction generally will be construed together as a single contract.  *W.T. Rawleigh Co. v. Wilkes*, 121 S.W.2d 886, 888 (Ark. 1938).  The drafts here were executed as part of the same transaction as the lease agreements and the drafts were executed at substantially the same time.  Furthermore, each draft specifically references a corresponding lease agreement and only the drafts, not the lease agreements, were signed by Arrington's agents. Under these circumstances, each lease agreement and its corresponding drafts must be construed together as a single contract.  Therefore, we must now turn to Arrington's arguments that the no-liability clause, lease approval clause, and title approval clause each excuse its failure to pay the cash bonuses.

### A.    The No-Liability Clause

Arrington contends that the district court erred in holding that the parties formed enforceable agreements because the contracts fail for lack of mutuality of obligation.  *See City of Dardanelle v. City of Russellville*, 277 S.W.3d 562, 565-66 (Ark. 2008) (holding that mutuality of obligation is one of five "essential elements of a contract").  Arrington argues that the bank drafts' no-liability clause, which states

-7-

that "no liability for payment or otherwise shall be attached to any of the parties hereto" if the drafts are not paid during the escrow period, precludes contract formation under the lease agreements unless and until Arrington pays on the drafts. It contends that the lease agreements signed by the landowners were merely offers to lease and therefore that both parties were free to "walk away" for any reason prior to Arrington paying on the drafts. This court must predict how the Arkansas Supreme Court would decide this issue. *See Raines*, 637 F.3d at 875. Because Arkansas law requires us to look to "the contract as a whole and the circumstances surrounding its execution," *Griffin*, 832 S.W.2d at 820, we conclude that the Arkansas Supreme Court would hold that the no-liability clause does not negate the mutuality of obligation in the underlying lease agreements when construed in harmony with the terms of the lease agreements.

Arrington's position that either party was free from obligation under the lease agreements unless and until Arrington paid the drafts is belied by various terms in the lease agreements. For example, the lease agreements recite an immediate exchange of the lease "for and in consideration of a cash bonus in hand paid, the receipt of which is hereby acknowledged." Furthermore, the duration of the lease and the renewal periods, recited respectively in Paragraphs 1 and 21, begin to run on the date of execution. The lease agreements affirmatively declare in Paragraph 13 that "[t]his lease shall be effective as to each Lessor on execution hereof as to his or her interest and shall be binding on those signing." The lessors' obligations upon signing included the duty in Paragraph 15 to warrant and defend the title to the property and the duty in Paragraph 16 to give Arrington "a reasonable period of time within which to comply with [any] covenant, condition, obligation, or requirement" of the lease before terminating the lease. Viewing the contract as a whole, these provisions indicate that a contract was formed when the landmen accepted the lease agreements in exchange for the bank drafts.

While Arrington's reading of the no-liability clause would impermissibly negate all of these contractual provisions, there is another reading of the no-liability clause by which "the contract can be construed to give effect to all provisions." *Tyson Foods*, 147 S.W.3d at 686. The subject of the no-liability clause is "this draft"—that is, the *draft*, a particular instrument of payment, rather than the underlying contractual payment obligations. In other words, the exculpating power of the no-liability clause most naturally applies only to eliminating any potential liability created by return of the draft, something analogous to "returned check" liability. This interpretation of the no-liability clause is consistent with the sentence immediately preceding the clause, in which the collecting bank is exempted from liability for refusing to return the draft during the escrow period. This interpretation also is consistent with the position of the no-liability clause in the section of the draft language dealing with the terms of the escrow of the draft. The no-liability clause, like each of the other terms following the payment amount, relates to the negotiability of this particular instrument—the draft—and does not purport to negate underlying liabilities arising from the lease agreement. In short, construing the no-liability clause to exculpate only liability arising out of the return of the draft harmonizes the clause with the obligations and terms provided for in the lease agreement, as required by Arkansas rules of contract interpretation. *See id.*

Arrington argues that *Spellman v. Lyons Petroleum, Inc.*, 709 S.W.2d 295 (Tex. Ct. App. 1986), suggests a different result. In *Spellman*, the Court of Appeals of Texas interpreted an identical no-liability clause on a bank draft and held that it voided any contract liability arising under the bank draft because there was "no requirement that the plaintiff make a reasonable effort to perform." *Id.* at 297. Arrington contends that Arkansas courts likely would adopt *Spellman* because Arkansas similarly requires mutuality of obligation. *See Dardanelle*, 277 S.W.3d at 565-66. Nevertheless, a close reading of *Spellman* demonstrates that its holding was limited to liability arising solely under the bank draft, not the transaction as a whole. *See Spellman*, 709 S.W.2d at 296-98. Because the lessors canceled the lease

agreement before they tendered it (effectively revoking their "offer" before the lease agreement ever took effect) and because the no-liability clause prevented liability from arising from the draft alone, there was no mutuality of obligation. *See id.* at 298. If the no-liability clause on the draft had been sufficient to void the related lease agreement, then the court in *Spellman* would have had no need to discuss whether the lessors canceled the lease prior to tendering the lease. Thus, the holding in *Spellman* must have been limited to liabilities arising solely from the draft itself. Here, in contrast, there is no evidence that either party canceled the lease agreements before the landowners tendered them. Thus, we are unpersuaded that the Arkansas Supreme Court would adopt *Spellman* in these cases where the lease agreements were not canceled before they were tendered, especially where the no-liability clause is rendered ambiguous when read in conjunction with the lease agreement.[4]

Because Arrington's interpretation would impermissibly nullify the provisions of the lease agreements cited above when the no-liability clause can be read to "harmonize" with those same provisions, *Griffin*, 832 S.W.2d at 820, we conclude that the drafts' no-liability clause does not prevent enforcement of the lease agreements. Having concluded that Arrington entered into a binding contract with each respective landowner despite the drafts' no-liability clause, we next consider the effect of conditions precedent on the breach claims.

---

[4]The no-liability clause is ambiguous because it is susceptible to more than one reasonable interpretation. Ambiguous language "is to be construed most strongly against the party that prepared it," *Harris*, 832 S.W.2d at 840, and "[a]mbiguities in an oil and gas lease should be construed in favor of the lessor and against the lessee." *Hanna Oil & Gas Co. v. Taylor*, 759 S.W.2d 563, 565 (Ark. 1988). Arrington, as the lessor and preparer of the lease agreements and drafts, loses on both counts. As the Court of Appeals of Texas recognized in *Spellman*, it is "appropriate that the language [of the no-liability clause] be construed against the one who selected its use." *Spellman*, 709 S.W.2d at 298.

## B. The Lease Approval Clause

Arrington contends that even if the no-liability clause did not prevent formation of the contracts, no payment obligations arose because Arrington never "approved" the leases. The drafts authorize payment "[o]n approval of lease or mineral deed described hereon." Arrington argues that this language made payment obligations conditional on Arrington affirmatively approving the leases through the act of paying the drafts and that any other interpretation of the clause would impermissibly render the lease approval clause a nullity. Arrington relies on another Texas case interpreting an approval requirement on the face of a bank draft. In *Encina P'ship v. Corenergy, L.L.C.*, 50 S.W.3d 66 (Tex. Ct. App. 2001), a landman working on behalf of an oil and gas company issued a draft to a rancher in exchange for a permit to conduct seismic testing for oil and gas deposits on the ranch. The draft stated the condition "on approval of seismic permit or lease described hereon." *Id.* at 69. The oil and gas company dishonored the draft, and the rancher sued for breach of contract. *Id.* The *Encina* court held that because the lessee "disapproved of the permit, it was protected from paying for the permit to conduct testing on the Encina ranch." *Id.* Arrington argues that, as in *Encina*, the draft notation "[o]n approval of lease or mineral deed described hereon" is a condition precedent that gave it broad discretion to disapprove of the transaction brokered by its landman. However, we are not convinced that Arkansas courts would follow the *Encina* court's reasoning in light of the undisputed facts of this case.

As an initial matter, the very acceptance of the executed lease agreements by Arrington's agents satisfies the "on approval" requirement of the draft.[5] *See*

---

[5]Arrington's landmen signed the drafts and accepted the executed lease agreements in exchange for those drafts. Although Arrington characterized the landmen as independent contractors in its briefs, it accepted at oral argument that they were Arrington's agents. Oral Arg. Recording at 16:06; *see Langel v. United States*, 451 F.2d 957, 963 (8th Cir. 1971) (declining to consider contentions abandoned at

-11-

Merriam-Webster Collegiate Dictionary 61 (11th ed. 2003) (defining "on approval" as "subject to a prospective buyer's acceptance or refusal"). Moreover, in construing the lease approval clause, Arkansas law also dictates that we look to the circumstances surrounding the parties' transaction to determine the parties' intent. *See Griffin*, 832 S.W.2d at 820. Here, the lease agreements were prepared entirely by Arrington and were presented to the landowners by Arrington's authorized agents. These lease agreements purported to bind the lessors on the date of execution. *See supra* Part II.A. Because the drafts were given to the landowners at the same time that Arrington's agents accepted the executed lease agreements, the circumstances support a reasonable understanding that the exchange itself was the "approval" described on the drafts. Finally, the lease approval language is not a nullity under this reading, as it allows a misdirected draft to be dishonored by Arrington in a case where an executed lease agreement was not accepted by its agents.

Arrington's reading of the lease approval clause, while reasonable, is no more consistent with the plain language of the lease agreements than the landowners' contention that Arrington approved the leases when its agents accepted the executed lease agreements in exchange for the bank drafts. To the extent that both interpretations of the "lease approval" language are plausible, any ambiguity must be resolved in the landowners' favor. *See Harris*, 832 S.W.2d at 840; *Hanna Oil*, 759 S.W.2d at 565. Thus, the lease approval language of the drafts was satisfied by Arrington's acceptance of the lease agreements in exchange for the signed bank drafts, and as such it does not bar enforcement of the contracts.

---

oral argument).

## C. The Title Approval Clause

The drafts expressly provided Arrington as drawee with a stated number of banking days in which to approve the titles to lessors' properties. The only plausible reading of the title approval condition is that it is a condition precedent of the contract. For example, a Texas court, interpreting an almost identical provision, acknowledged the parties' agreement that the time period stated on the draft existed primarily to provide time in which to review the condition of title. *Broughton Assocs. Joint Venture v. Boudreaux,* 70 S.W.3d 324, 328 (Tex. Ct. App. 2002). Thus, the district court correctly concluded that Arrington's payment obligations were subject to its right to disapprove of titles in good faith during the times stated on the drafts. Relying on this condition precedent, Arrington contends that no payment obligations arose because it never approved the landowners' titles.

Under Arkansas law, however, parties to a contract have an affirmative duty to exercise good faith and fair dealing in the fulfillment of conditions precedent in a contract. *Cantrell-Waind & Assocs., Inc. v. Guillaume Motorsports, Inc.*, 968 S.W.2d 72, 75 (Ark. Ct. App. 1998) (citing Restatement (Second) of Contracts § 205 (1981)). In particular, if a condition in the contract permits a party to make a discretionary decision, that decision must be made in good faith and for valid reasons. *Hendrix v. Sidney M. Thom & Co.*, 609 S.W.2d 98, 101 (Ark. 1980) (holding that a discretionary site-approval condition did not make a contract unenforceable because the party with discretion could not invoke the condition to avoid obligations under the contract except in good faith and for valid reasons). Thus, Arrington could only reject the transaction under the title approval clause in good faith and for reasons related to title. Arrington admits that it "decided to decline lease offers and not to pay drafts in Phillips County for business reasons." Arrington also admits that it has no record of title disapproval for the landowners' lease agreements. Arrington contends, however, that these admissions do not provide sufficient evidence for the court to enter judgment as a matter of law.

-13-

Arrington first argues that its decision under the title approval clause should only be suspect if it was "arbitrary or capricious." *See Leroy v. Harwood*, 178 S.W. 427, 431 (Ark. 1915). Arrington contends that it was reasonable, and therefore not arbitrary or capricious, to refuse payment on the drafts based on business considerations unrelated to title. However, longstanding Arkansas case law requires more than that a party's discretion be based on *reasonable* considerations; it also requires that such considerations be *relevant* to the condition recited in the agreement. *See id.* at 430-31 (holding that buyer's payment obligations under real estate sale contract were excused by title approval condition because the buyer "in good faith passed upon the title and declared the same unsatisfactory" and because buyer's decision was not arbitrary or capricious). Arrington's admitted renunciation of the lease agreement for reasons unrelated to title precludes this defense to the enforceability of its contracts.

Arrington next argues that the district court improperly shifted the burden of proof to Arrington by equating a "lack of proof of a decision on title" with "a lack of good faith, which was assumed to be the equivalent of bad faith." Contrary to Arrington's assertions, the district court did not hold that Arrington's failure to prove that it had conducted a title search established bad faith. Instead, Arrington's admission that it relied on business considerations unrelated to title concerns provided sufficient evidence that Arrington's decision to dishonor the drafts was unrelated to title and that Arrington thus could not invoke the title approval clause to excuse its payment obligations. To be sure, Arrington's general admission that it decided to deny all drafts in Phillips County because of business and financial considerations does not preclude Arrington from offering evidence that it also declined to pay some drafts based on a good-faith disapproval of title. The drafts at issue here are encompassed by that general admission because they were denied after July 26, 2006, and were issued for properties located in Phillips County. Absent some evidence that these specific drafts were in fact rejected based on title considerations, however, Arrington's admission that it decided to dishonor all lease

-14-

agreements in Phillips County for unrelated business reasons entitled the landowners to summary judgment.

Finally, Arrington argues that it did present evidence that it denied the drafts at issue at least in part due to its good-faith disapproval of title even if it also decided to dishonor the drafts based on business considerations.[6] Arrington offered affidavits stating that the Halls had previously received a bank draft in March 2006, and that this previous draft was returned unpaid on July 11, 2006, and marked with the handwritten notation, "Do Not pay[,] title not complete." Arrington also submitted copies of drafts for properties in Phillips County that are not related to this litigation. These latter drafts were returned unpaid after July 26, 2006, and were marked with the handwritten notation, "Do not pay[,] title failed and/or not complete" or, "Do not pay[,] title not complete." Arrington contends that, based on this evidence, a reasonable jury could conclude that the drafts at issue were dishonored based on title considerations after July 26, 2006.

We disagree. Arrington's failure to complete a title search ("title not complete") is very different from completing a title search and disapproving of the title ("title failed"). Because only a good faith *disapproval* of title would justify invocation of the condition precedent and because none of the returned drafts advanced by Arrington indicate which of the two alternatives Arrington invoked in denying the drafts, these notations do not demonstrate that Arrington "in good faith passed upon the title[s] and declared the same unsatisfactory." *Leroy*, 178 S.W. at 430-31. In the face of Arrington's admission that it decided on July 26, 2006, to dishonor all bank drafts for properties in Phillips County based on purely business

---

[6]Arrington argues in the alternative that, "[w]hile Arrington did not rely on title in declining to pay the draft, it never foreclosed its right to do so." Arrington produced an affidavit by a title agent stating that Arrington would not approve the titles at issue based on the title searches he conducted in 2010. The issue here, however, is not the condition of titles in 2010 or even in 2006, but whether Arrington disapproved of the titles in good faith before the times stated on the drafts expired.

-15-

considerations that were unrelated to title, inconclusive notations indicating that Arrington may or may not have completed a review of the titles for drafts in similar transactions do not create a genuine issue of material fact as to whether Arrington disapproved of the landowners' titles in good faith in the instant cases. With no evidence in the record to generate a dispute on this issue, the district court did not err in granting summary judgment on the breach of contract claims.[7]

## III.    CONCLUSION

For the foregoing reasons, we affirm.

COLLOTON, Circuit Judge, concurring in the judgment.

Arrington Oil & Gas, Inc., presents a substantial argument that the decision in *Spellman v. Lyons Petroleum, Inc.*, 709 S.W.2d 295 (Tex. App. 1986), supports its position that the "no-liability clause" in the drafts that Arrington delivered to the plaintiffs in these cases caused the putative lease agreements to fail for lack of mutuality.  The "dispositive issue" in *Spellman* was whether a "lease and accompanying draft created an irrevocable and binding agreement" between a lessor and lessee. *Id.* at 296.  The draft in *Spellman* contained language identical to the drafts in these cases:  "In the event this draft is not paid within said time, the collecting bank shall return the same to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto." *Id.* at 297.

The lessee in *Spellman* argued that the "lease and draft constitute a legally binding instrument," while his opponent urged that the "no liability" language of the

---

[7]Arrington asks that the district court's orders awarding interest, costs, and attorneys' fees be reversed if this court reverses the summary judgment orders on the breach of contract claims but did not dispute the amounts of these awards on appeal. Because we affirm the orders of summary judgment on the breach of contract claims, we also affirm the orders awarding interest, costs, and fees.

draft "causes the contract to fail for want of mutuality." *Id.* The Texas Court of Appeals held that the lease and draft did not constitute a legally binding agreement, because the "no liability" clause in the draft caused "the contract" to fail for lack of mutuality. *Id.* at 298. The "contract" at issue was an oil and gas lease, not merely a draft. The whole case was about "which of two different oil and gas leases" was valid. *Id.* at 296. That the court proceeded to reject an alternative argument of the lessee as to why his lease became binding does not vitiate the court's analysis of the no-liability clause and lack of mutuality in the lease agreement.

If the facts in these cases were identical to those reported in *Spellman*, then there would be good reason to believe that the Arkansas courts would follow the Texas rule, given the Arkansas law on mutuality, *see City of Dardanelle v. City of Russellville*, 277 S.W.3d 562, 566 (Ark. 2008), and the settled expectations of the industry in a neighboring State. Two factors, however, lead me to conclude that *Spellman* is distinguishable.

First, Arrington's interpretation of the drafts is in tension with certain provisions of the particular leases at issue in these cases, as set forth in Part II.A of the court's opinion. *Ante*, at 8. The difficulty in harmonizing the terms of these particular leases with Arrington's interpretation of the drafts results in ambiguity: The no-liability clause in these cases might apply only to the drafts, not to the leases. *Ante*, at 9. Second, the Supreme Court of Arkansas has held that "[a]mbiguities in an oil and gas lease should be construed in favor of the lessor and against the lessee." *Hanna Oil & Gas Co. v. Taylor*, 759 S.W.2d 563, 565 (Ark. 1988). It is difficult to see why the Arkansas court would apply a different rule to ambiguities in a draft, a payment instrument directly associated with an oil and gas lease. Thus, the combination of ambiguity arising from the terms of these particular documents and the Arkansas rule on construction of ambiguous instruments suggests that the Arkansas courts would adopt the construction most favorable to the lessors.

-17-

For these reasons, and substantially for those set forth in Parts II.B and II.C of the opinion of the court, I concur in the judgment.

_____