# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1692
_____

Jane Doe, by next friend Anthony E. Rothert

*Plaintiff - Appellee*

v.

Michelle Chapman, in her official capacity as Circuit Clerk for Randolph County

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Hannibal
_____

Submitted: January 12, 2022
Filed: April 7, 2022
_____

Before BENTON, SHEPHERD, and STRAS, Circuit Judges.
_____

BENTON, Circuit Judge.

In Missouri, an abortion may not be performed on a woman under the age of 18 without, as relevant here, the informed written consent of one parent or guardian. **§ 188.028.1(1), RSMo 2016**. A minor may bypass this requirement by obtaining a court order granting the right to self-consent (for mature minors), or judicial consent (for "best interests" minors). **§§ 188.028.1(3), 188.028.2(3)**. The minor (or next friend) must apply to the juvenile court. **§ 188.028.2(1)**. Within five days, the

juvenile court must hold a hearing. **§ 188.028.2(2)**. The juvenile court may then (a) find the minor is sufficiently mature and grant the right to self-consent, (b) find the abortion is in her best interests and give judicial consent, or (c) deny the petition. **§ 188.028.2(3)**. The current text of § 188.028 neither requires nor prohibits pre-hearing parental notification.

Jane Doe, then 17 years old, discovered she was pregnant in December 2018. Seeking an abortion, she went to the Randolph County Courthouse to apply for a judicial bypass. An employee at the clerk's office hadn't heard of the judicial bypass procedure, said they would do some research, and told Doe to come back later. A few weeks later, Doe returned. An employee told her "they were pretty sure that [she] could not open the petition without notifying a parent." After this second visit, Doe received a call from the circuit clerk of Randolph County, Michelle A. Chapman. She offered to provide an application form but said that "our Judge requires that the parents will be notified of the hearing on this." Returning to the courthouse in mid-January, Doe was again told that a parent would be notified if she filed an application. She eventually traveled to Illinois in March 2019, obtained a judicial bypass, and had an abortion without parental consent or notification.

Doe sued Chapman in her individual and official capacities under 42 U.S.C. § 1983, alleging that Chapman's refusal to allow her to apply for a judicial bypass without parental notification violated her Fourteenth Amendment rights. Chapman moved for summary judgment, invoking quasi-judicial and qualified immunity. The district court[1] denied the motion. Chapman appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

This court reviews de novo the denial of summary judgment based on quasi-judicial and qualified immunity. ***VanHorn v. Oelschlager***, 457 F.3d 844, 847 (8th Cir. 2006).

---

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

I.

Chapman asserts quasi-judicial immunity, claiming she acted at the direction of Associate Circuit Judge James Cooksey, the juvenile judge in Randolph County. Chapman testified she "chatted with James Cooksey" and "his ad-- his words were that he would require us to send notification to these parties."  She added that Judge Cooksey "advised that he would not hear the case without giving notice to the parents," and that she was simply "following what he said he was going to require to hear the case."  After her call with Doe, Chapman sent an email to a juvenile officer confirming that "I also let her know that our Judge requires that the parents will be notified of the hearing on this."

The district court agreed that, if Chapman acted at the direction of a judge, she would be shielded by quasi-judicial immunity.  *See* **Rogers v. Bruntrager**, 841 F.2d 853, 856 (8th Cir. 1988); **McCaw v. Winter**, 745 F.2d 533, 534 (8th Cir. 1984). However, when Judge Cooksey was asked if he ever told Chapman not to accept an application without notifying Doe's parents, he testified, "Not to my recollection.  I wouldn't have had any authority to do that unless something was filed and I looked at the law.  It's not how I usually would operate."  The district court, "[v]iewing this testimony in the light most favorable to plaintiff and drawing all reasonable inferences in her favor," found a genuine dispute of material fact whether Judge Cooksey gave Chapman a direction about Doe.

Chapman argues that Judge Cooksey's statements do not create a genuine dispute of material fact because a lack of memory, by itself, is insufficient.

True, a lack of memory does not, alone, create a genuine dispute of material fact. *See, e.g.,* **To v. U.S. Bancorp**, 651 F.3d 888, 892 n.2, 893 (8th Cir. 2011) ("An assertion that a party does not recall an event does not itself create a question of material fact about whether the event did, in fact, occur . . . . To's lack of memory does not create a genuine factual dispute."), *citing* **Elnashar v. Speedway SuperAmerica, LLC**, 484 F.3d 1046, 1057 (8th Cir. 2007) ("Erickson's inability to

-3-

recall the hours-reduction policy does not dispute Stehr and Schneider's testimony that the policy existed."). But Judge Cooksey's testimony does not convey only a lack of memory. It references a regular practice of declining to give pre-filing directions. The question is whether this practice evidence creates a genuine dispute of material fact whether Judge Cooksey gave Chapman a pre-filing direction.

Federal courts consider "all admissible evidence" on a motion for summary judgment. *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 759 (8th Cir. 2015); *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) ("[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial— it is whether it *could* be presented at trial in an admissible form."), *citing* **Fed. R. Civ. P. 56(c)(2)** ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

"Rule 406 provides that '[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine.'" *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 881 (8th Cir. 2015), *quoting* **Fed. R. Evid. 406**. The rule reflects "general agreement" that habit evidence "is highly persuasive as proof of conduct on a particular occasion." **Fed. R. Evid. 406, Notes of Advisory Committee**, ¶ 4 (1972). The notes define "habit" as "the person's regular practice of meeting a particular kind of situation with a specific type of conduct." *Id.* at ¶ 2.

Because all admissible evidence is considered on summary judgment, and because Rule 406 admits habit evidence, habit evidence is considered on summary judgment. "Courts may accept Rule 406 evidence at the summary judgment stage as providing an inference that a routine practice was actually carried out." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261-62 (10th Cir. 2012) (summary judgment declarations of employees about the standard practice for acceptance of contract terms were evidence that particular customers accepted the terms), *citing Morris v. Travelers Indem. Co. of Am.,* 518 F.3d 755, 761 (10th Cir. 2008) (reversing summary judgment where district court failed to consider testimony about insurance

agent's regular sales practices); ***Gould v. Winstar Commc'ns, Inc.***, 692 F.3d 148, 161 (2d Cir. 2012) (reversing summary judgment where an investment analyst was "unable to recall specifically" whether she reviewed an opinion letter endorsing a stock, but "there was evidence that she actively reviewed such letters as a matter of practice in deciding whether to recommend certain stocks" and explaining that "[a]t this stage of the proceedings, Asher's testimony is enough; from that evidence, a jury reasonably could infer that she actually reviewed and relied on the relevant statements in the documents"); ***Rogers v. Evans***, 792 F.2d 1052, 1061 (11th Cir. 1986) (considering on summary judgment a prison doctor's testimony that she "would [not] normally describe a patient as faking," even though she did not recall what she said about a particular prisoner).

This court considers habit evidence on summary judgment. In *Yellow Horse v. Pennington County*, a prisoner's estate sued a corrections officer, alleging deliberate indifference to the prisoner's mental health needs and suicide risk. ***Yellow Horse v. Pennington Cty.***, 225 F.3d 923, 925-26 (8th Cir. 2000). The officer moved for summary judgment. The officer could not "specifically recall taking Yellow Horse off suicide watch." *Id.* at 927. She did testify that her "routine practice for removing someone from suicide watch was that she would gather information by reviewing the contact journal, which contained information on the eating, sleeping and social habits of the inmate, and then interview and evaluate the inmate before removing him from suicide watch." *Id.* This court relied on habit evidence:

> The estate makes much of Severson's failure to specifically recall taking Yellow Horse off suicide watch. However, Severson's . . . . failure to specifically remember taking Yellow Horse off suicide watch is hardly surprising in light of the intervening time between the suicide and the statements, and does not create a genuine issue of material fact. Severson testified that if she did, in fact, remove Yellow Horse from the watch, the aforementioned process would have been followed. The estate cannot show otherwise, and therefore cannot meet its burden of establishing a material fact which would preclude summary judgment in favor of Severson.

*Id.* at 927-28. *See also **McPherson v. O'Reilly Auto., Inc.***, 491 F.3d 726, 729 (8th Cir. 2007) (granting summary judgment based on vocational counselor's testimony that "it was her habit to identify herself" when calling employers to verify employment information).

Habit evidence may also be used to *defeat* a motion for summary judgment. In *County of Harding v. Frithiof*, a county sued to void its lease agreement with a fossil hunter because the county commission did not hold a public hearing before approving the lease. ***Cty. of Harding v. Frithiof***, 483 F.3d 541, 544 (8th Cir. 2007). The district court granted summary judgment to the county, finding that the annual value of the lease exceeded $500—the threshold requiring a hearing. ***Id.*** at 545-46, *quoting* **SDCL § 7-18-32**. This court reversed, holding that the county's "past practice of not holding a public hearing on contingency-based fossil-collecting leases" created the inference that the annual value of such leases was less than $500—an inference "the district court was required to accept . . . for purposes of summary judgment." ***Id.*** at 549-50.

*Smith v. Arrington Oil & Gas, Inc.* is not to the contrary. There, a company refused to pay bank-drafts to oil and gas lessors, alleging disapproval of title. ***Smith v. Arrington Oil & Gas, Inc.***, 664 F.3d 1208, 1211-12 (8th Cir. 2012). The lessors claimed the refusal had nothing to do with title, emphasizing the company's admission in a separate case that it abandoned other leases in their county because of an unproductive well. ***Id.*** The company countered with unpaid bank-drafts for properties not involved in the litigation, marked with handwritten notations: "Do Not pay[,] title not complete," "Do not pay[,] title failed and/or not complete," and "Do not pay[,] title not complete." ***Id.*** at 1217. The company contended that, based on these other drafts, a reasonable jury could conclude that the disputed drafts were dishonored due to disapproval of title. ***Id.*** This court determined the notations were "inconclusive" whether the company searched title and found grounds for disapproval, or merely failed to search title. ***Id.*** at 1217-18. This court concluded that evidence showing the company "may or may not have completed a review of the titles for drafts in similar transactions [did] not create a genuine issue of material

fact as to whether [the company] disapproved of the landowners' titles in good faith in the instant cases." *Id.* at 1218 (alterations added).  Terms like "habit," "practice," and "Rule 406" do not appear in that opinion.

Here, Judge Cooksey testified that giving a pre-filing direction about Missouri's judicial bypass procedure is "not how I usually would operate" based on his belief that he "wouldn't have had any authority to do that unless something was filed and I looked at the law."  His testimony shows a "regular practice of meeting a particular kind of situation with a specific type of conduct."  **Fed. R. Evid. 406, Notes of Advisory Committee,** ¶ 2 (1972).  Not only is this habit evidence admissible; it is "highly persuasive" that, on the particular occasion here, Judge Cooksey acted in accordance with his practice of not giving pre-filing directions. *Id.* at ¶ 4.

The Supreme Court's "repeated" admonition is that "the plaintiff, to survive the defendant's [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (alteration added).  A reasonable jury could conclude that Judge Cooksey has a regular practice of not giving pre-filing directions, and based on that practice, he did not give a pre-filing direction to Chapman.  A reasonable jury could alternatively conclude that, on this occasion, Judge Cooksey departed from his regular practice of not giving pre-filing directions.  "What weight to give competing testimony is a credibility issue, one properly left to the fact-finder." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).  The district court correctly denied summary judgment based on quasi-judicial immunity.

II.

Public officials are protected by qualified immunity unless the facts show a violation of a constitutional right that was clearly established at the time of the alleged misconduct. *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc).  Doe claims that Chapman violated her clearly established constitutional right to apply for a judicial bypass without notifying her parents.  Chapman counters that

(1) the Supreme Court has not recognized a constitutional right to apply for a judicial bypass without pre-hearing parental notification; (2) there is a circuit split on the issue; and (3) this court's decision in *Planned Parenthood Ass'n of Kansas City, Missouri, Inc. v. Ashcroft* is not controlling because (a) it is factually distinguishable, (b) a single holding of this court does not make a right clearly established, and (c) clerks of Missouri courts are not bound by Eighth Circuit precedent.

The Supreme Court distinguishes "parental consent statutes" (that require a parent's consent or a court order before an abortion) *from* "parental notice statutes" (that require abortion providers to notify a parent before an abortion).

The first parental consent statute confronted by the Court—from Missouri—required the consent of at least one parent to perform an abortion on an unmarried woman under the age of 18. **Planned Parenthood of Cent. Missouri v. Danforth**, 428 U.S. 52, 72 (1976). It had no procedure to bypass the consent requirement. **Id.** The Court held that, "in order to prevent another person from having an absolute veto power over a minor's decision to have an abortion, a State must provide some sort of bypass procedure if it elects to require parental consent." **Ohio v. Akron Ctr. for Reprod. Health**, 497 U.S. 502, 510-11 (1990), *describing* **Danforth**, 428 U.S. at 74.

Three years after *Danforth*, the Court reviewed a Massachusetts statute that allowed minors to seek a judicial bypass, but only after at least one parent refused consent. **Bellotti v. Baird**, 443 U.S. 622, 625 (1979). The Massachusetts Supreme Judicial Court had confirmed that, under the statute, "an available parent must be given notice of any judicial proceedings brought by a minor to obtain consent for an abortion." **Id.** at 646. Eight Supreme Court justices decided that the statute, construed in this manner, placed an undue burden on pregnant minors. Justice Powell's plurality opinion (joined by three other justices), concluded:

> [E]very minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents. If

she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her best interests.

*Id.* at 647-48. Justice Stevens (joined by three other justices) would not have allowed even a judge to decide whether an abortion is in an immature minor's best interests, leaving the decision to the physician and patient. *Id.* at 654-56 (Stephens, J., concurring in the judgment). But the concurrence agreed that parental notice, pre-hearing, was unconstitutional. *Id.* at 656 (agreeing that "the statute . . . as . . . construed [by the Massachusetts Supreme Judicial Court] is not constitutional"). Dissenting, Justice White recognized the "Court's holding" that parents may not be given "notice that their daughter seeks [a judicial bypass] and, if they object to the abortion, an opportunity to participate in a hearing." *Id.* at 657 (White, J., dissenting) (alteration added). *Accord* **Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft**, 462 U.S. 476, 503-04 (1983) (Blackmun, J., concurring in part) (explaining the opinions in *Bellotti*).

Later, the Court reviewed an Ohio statute that allowed physicians to perform an abortion on a minor—with or without parental consent—if they provided at least 24-hours' notice to one of the minor's parents. **Akron**, 497 U.S. at 507. The Court identified the law as a "parental notice statute," in contrast to the "parental consent statutes in *Danforth* [and] *Bellotti*." *Id.* at 510 (alteration added). The Court stated that "our cases have required bypass procedures for parental consent statutes," but "we have not decided whether parental notice statutes must contain such procedures." *Id.* The Court has yet to answer that question. *See* **Lambert v. Wicklund**, 520 U.S. 292, 295 (1997) ("In *Bellotti,* we struck down a statute requiring a minor to obtain the *consent* of both parents before having an abortion, subject to a judicial bypass provision . . . . In *Akron,* we upheld a statute requiring a minor to *notify* one parent before having an abortion . . . . We declined to decide whether a parental notification statute must include some sort of bypass provision to be

constitutional."); ***Zbaraz v. Madigan***, 572 F.3d 370, 380 (7th Cir. 2009) ("[T]he Supreme Court has repeatedly stated that it has declined to decide whether a parental notification statute must include some sort of bypass provision to be constitutional.") (quotation marks omitted). *Cf.* ***H. L. v. Matheson***, 450 U.S. 398, 407-10 (1981) (parental notice statute with no bypass procedure was constitutional as applied to an unemancipated minor "living with and dependent upon her parents . . . when she has made no claim or showing as to her maturity").

This court applied the Supreme Court's distinction between parental consent statutes and parental notice statutes in *Ashcroft* and *Miller*. *Ashcroft* addressed a previous version of § 188.028 that, like the statute in *Bellotti*, required parental consent or a judicial bypass, and required parental notification prior to the judicial bypass hearing. ***Planned Parenthood Ass'n of Kansas City, Missouri, Inc. v. Ashcroft***, 655 F.2d 848, 859 (8th Cir. 1981). This court held that *Bellotti* controlled:

> We are thus faced with the question . . . whether it is constitutionally permissible to require mature or "best interests" minors to notify their parents prior to a court hearing in which they seek judicial consent for an abortion. We have no need to analyze this problem at length, as the justices of the Supreme Court have already explored it.

*Id*. This court quoted *Bellotti's* holding that "(E)very minor must have the opportunity if she so desires to go directly to court without first consulting or notifying her parents." *Id.* at 858. This court concluded that "subsection 188.028.2(2) is unconstitutional because it requires mature or 'best interests' minors to give notice to their parents prior to the court hearing." *Id.* at 859. After *Ashcroft*, Missouri repealed the pre-hearing notice requirement. *See* 1986 **Mo. Laws** 691-92 (H.B.1596).

On the other hand, addressing a statute that did *not* require parental consent—but did require parental notification before the abortion itself—this court acknowledged that Supreme Court precedent is inconclusive: "the Supreme Court has yet to decide whether a mature or 'best interest' minor is unduly burdened when

-10-

a State requires her physician to notify one of her parents before performing the abortion." ***Planned Parenthood, Sioux Falls Clinic v. Miller***, 63 F.3d 1452, 1459 (8th Cir. 1995).  This court ultimately held that a state "may not impose a parental-notice requirement without also providing a confidential, expeditious mechanism by which mature and 'best interest' minors can avoid it.  In short, parental-notice provisions, like parental-consent provisions, are unconstitutional without a *Bellotti*-type bypass." ***Id.*** at 1460. *But see **Planned Parenthood of Blue Ridge v. Camblos***, 155 F.3d 352, 367 (4th Cir. 1998) (concluding that "the Constitution does not require for 'mere notice' statutes the full panoply of safeguards required by the Court in *Bellotti II* for parental consent statutes" and holding that parental notice statutes are constitutional even without a bypass procedure).

Relying on parental notice cases like *Akron* (and *Miller* and *Camblos*), Chapman argues she could not have deprived Doe of a clearly established right because Supreme Court precedent is inconclusive, and circuits courts are split.  But § 188.028 is not a "mere notice statute"; it requires parental consent—or a court order bypassing parental consent—exactly like the statute in *Bellotti* (and *Ashcroft*). *Bellotti* is clear:  parental consent statutes are unconstitutional unless they provide the pregnant minor an opportunity to seek a court order without notifying her parents. ***Bellotti***, 443 U.S. at 647-48; ***id.*** at 656 (concurring opinion).  By requiring notice to Doe's parents before her bypass hearing, Chapman implemented the prior version of § 188.028 this court found unconstitutional under *Bellotti*. ***Ashcroft***, 655 F.2d at 859 ("[S]ubsection 188.028.2(2) is unconstitutional because it requires mature or 'best interests' minors to give notice to their parents prior to the court hearing.").

Because Doe's constitutional right to apply for a judicial bypass without notifying her parents is clearly established by Supreme Court precedent, this court need not address Chapman's other arguments about qualified immunity.[2]

---

[2]In 2019, Missouri passed the Right to Life of the Unborn Child Act, which would override § 188.028:

* * * * * * *

The district court's order denying summary judgment is affirmed.

STRAS, Circuit Judge, dissenting.

Even giving Doe every benefit of the doubt on summary judgment, the evidence does not create a genuine issue of material fact. *See Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020) (explaining that we must view "the evidence . . . in a light most favorable to the nonmoving party" (citation omitted)). The record is filled with statement after statement from Judge Cooksey that he does not remember any of the details underlying this lawsuit. The question is whether one offhand remark—"[i]t's not how I would usually operate"—is enough to get this case past summary judgment. The court says it is. *See ante* at 3–7. Read in context, I conclude it is not.

---

> Notwithstanding any other provision of law to the contrary, no abortion shall be performed or induced upon a woman, except in cases of medical emergency . . . . The enactment of this section shall only become effective upon notification to the revisor of statutes by an opinion by the attorney general of Missouri, a proclamation by the governor of Missouri, or the adoption of a concurrent resolution by the Missouri general assembly that [t]he United States Supreme Court has overruled, in whole or in part, *Roe v. Wade*, 410 U.S. 113 (1973), restoring or granting to the state of Missouri the authority to regulate abortion.

**§ 188.017, RSMo Supp. 2019**. *See also **Doe v. Parson***, 960 F.3d 1115, 1116 (8th Cir. 2020) ("Missouri's official position is that '[t]he life of each human being begins at conception.'"). *See generally **MKB Mgmt. Corp. v. Stenehjem***, 795 F.3d 768, 773-76 (8th Cir. 2015) ("Although controlling Supreme Court precedent dictates the outcome in this case, good reasons exist for the Court to reevaluate its jurisprudence."); ***Little Rock Fam. Plan. Servs. v. Rutledge***, 984 F.3d 682, 692-93 (8th Cir. 2021) (Shepherd, J., concurring) (reiterating, as discussed at length in *MKB Mgmt. Corp.*, that the viability standard has proven unsatisfactory).

Let's begin with the basics. Everyone pretty much agrees that judicial immunity shields Michelle Chapman from liability if she was following Judge Cooksey's directions. *See ante* at 3; Appellee's Br. at 28; *see also Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988) ("Clerks of court have absolute immunity from actions for damages arising from acts they are specifically required to do . . . at a judge's direction." (quotation marks omitted)). So our task is to determine whether Doe has actually "set forth specific facts showing that" Chapman was acting on her own, without guidance from Judge Cooksey. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Rogers*, 841 F.2d at 856.

The court views this as a he said/she said case, one that is inappropriate for summary judgment. The problem is that we have a "she said," but no "he said." Chapman's position all along has been that she was following Judge Cooksey's directions when she told Doe that her parents would need to be notified. She has never wavered on that point.

Judge Cooksey, for his part, had trouble remembering anything. At his deposition, he repeatedly stated that he could not recall what he had said—or, for that matter, if he had said anything to Chapman at all. After being asked, for example, "[d]o you know who . . . Jane Doe is in this case," he said "no[,] . . . I mean I don't know who -- what her name is or who -- no." Then when asked "[w]hat understanding do you have, if any, about what this case is about[,]" Judge Cooksey said he had no "independent recollection of what this case is. Something about a notice to -- notification of parents because the children were young."

Judge Cooksey's inability to remember is clear, absent one cryptic remark. When asked about the directions he purportedly gave to Chapman, "[d]id you ever tell Michelle Chapman not to accept a petition for judicial -- a petition to obtain judicial consent to obtain an abortion without parental consent unless she sent notices to the natural born parents of the minor[,]" Judge Cooksey said "[n]ot to my recollection." But then he added, "I wouldn't have had any authority to do that unless something was filed and I looked at the law. It's not how I usually would

-13-

operate. I mean I don't have any recollection of ever doing that." He then went on to deny that he had "ever looked at the Missouri law regarding judicial bypasses."

What is the takeaway? Judge Cooksey has no memory of the events in question, but he believes he would not "usually" operate that way. I am unconvinced that this stray remark is enough for a trial because it is sandwiched between roughly a half-a-dozen statements containing some variation of "I don't remember." It is, in short, a "vague denial[]" couched in a series of "memory lapses," which by itself cannot create a genuine issue of material fact. *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 205 F.3d 66, 75 (2d Cir. 2000); *see also To v. U.S. Bancorp*, 651 F.3d 888, 892 n.2 (8th Cir. 2011) ("An assertion that a party does not recall an event does not itself create a question of material fact about whether the event did, in fact, occur.").

But let's assume for the moment that Judge Cooksey's description of what he would *not* "usually" do counts for something more. It is still not the "habit evidence" that the Court believes it to be. *See ante* at 4–6. For one thing, the statement is phrased in the negative and uses the word "usually," meaning that it does not eliminate the possibility that he did something different here.[3] For another, it cannot reflect a "regular practice" because he denied ever looking at Missouri law on "judicial bypasses." *See* Fed. R. Evid. 406 advisory committee's note (defining "habit" evidence). So besides being cryptic, the statement is "inconclusive." *See Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1218 (8th Cir. 2012) (noting that "inconclusive [evidence] indicating that [a party] may or may not have" done a particular thing "in similar transactions do[es] not create a genuine issue of material fact as to whether" the same party did the same thing "in the instant case[]"); *see*

---

[3]Consider a driver who gets in a car accident because he is drunk. At the scene, he says, "I do not usually drive drunk." This statement, by itself, would not eliminate the possibility that, on that particular night, he did. It almost goes without saying that, in the face of clear evidence that he was intoxicated at the time, the statement would not create a genuine issue of material fact. The same is true here.

*also Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

The bottom line is that there is no genuine issue of material fact here. The unrebutted evidence is that Chapman was acting "at [her] judge's direction," which entitles her to absolute immunity. *Martin v. Hendren*, 127 F.3d 720, 721 (8th Cir. 1997) (citation omitted).

_____