**DORCHESTER MINERALS, LP, Plaintiff**

v.

**CHESAPEAKE EXPLORATION, LLC, Defendant**

**No. 4:12CV00461 JLH**

United States District Court, E.D. Arkansas, Western Division.

Signed May 18, 2015

John Robert Beatty, Joseph A. Unis, Jr., Locke Lord LLP, Dallas, TX, Robert M. Honea, Hardin, Jesson & Terry, Fort Smith, AR, for Plaintiff.

Amy Lee Dashiell, Christopher Sileo, Scott, Douglass & McConnico, L.L.P., Austin, TX, Douglas M. Carson, Jerry L. Canfield, Daily & Woods, P.L.L.C., Fort Smith, AR, for Defendant.

## OPINION AND ORDER

### J. LEON HOLMES, UNITED STATES DISTRICT JUDGE

Dorchester Minerals, LP, is the lessor under an oil and gas lease in which Chesapeake Exploration, LLC, is the lessee. Dorchester contends that Chesapeake has failed to make gas royalty payments in accordance with the terms of the lease. The central issue concerns the interpretation of the gas royalty provision. The parties have filed cross motions for summary judgment on that issue. Chesapeake has also filed motions for summary judgment on other issues in the case. Dorchester also seeks summary judgment on its claim for accounting, and it has filed a motion to compel. For reasons that will be explained, all of the motions for summary judgment are denied, while Dorchester's motion to compel is granted in part and denied in part.

### I.

Dorchester owns mineral interests in approximately 9,857 acres in eight Arkansas counties. On July 27, 2006, Dorchester and Chesapeake entered into six oil and gas leases, permitting Chesapeake to drill for oil and gas on Dorchester's land in Van Buren, White, Cleburne, Faulkner, Pope, and Conway counties in Arkansas. Except for the property descriptions, the six leases are substantially identical. These six Arkansas counties form the core of the shale natural gas development play commonly referred to as the "Fayetteville Shale Gas Play." The Arkansas Oil and Gas Commission has identified the Fayetteville Shale as an unconventional source of supply within a twelve county area in north-central Arkansas. The Fayetteville Shale is subject to drilling rules established by Arkansas Oil and Gas Commission Rule B–43(c).

Chesapeake assigned a portion of its interest in the leases to BP America Production Company in 2009, and assigned the remainder of its interest in the leases to BHP Billiton Petroleum (North America 1) LLC in February 2011. Dorchester states that Chesapeake failed to obtain Dorchester's prior consent to these assignments as required under the terms of the leases, but

Chesapeake asserts that the leases permit assignment of its interests in the absence of written consent provided that Chesapeake remains liable for the performance of its assignees' obligations under the lease.

Dorchester's complaint contains five counts. Count I alleges that Chesapeake failed and refused to pay royalties to Dorchester in accordance with the lease. Count II alleges that Chesapeake failed to pay royalties within 180 days of commencing production of gas and, therefore, is liable for interest on the unpaid royalties at the rate of 12% per annum under Arkansas Code Annotated § 15–74–604. Count III alleges that pursuant to Arkansas Code Annotated § 15–74–602 Chesapeake is liable to Dorchester for a penalty of 14% of royalties because Chesapeake willfully withheld royalty payments without just cause or through bad faith. Count IV alleges that Chesapeake improperly deducted post production expenses from Dorchester's royalties in violation of the leases.[1] Count V alleges that Chesapeake has paid no royalties with respect to at least twenty wells. Finally, Count VI seeks an accounting, arguing that Chesapeake has exclusive control over the data that is necessary for calculating the amount of money Chesapeake owes to Dorchester under the lease.

## II. Cross Motions For Summary Judgment

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact is presented only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record. *Spencer v. Jackson Cnty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013). If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

Chesapeake seeks summary judgment over five of Dorchester's six claims.[2] Dor-

---

[1]. Chesapeake admits that it improperly deducted post production expenses from royalty payments made to Dorchester but says that since the commencement of this action it has refunded to Dorchester for those expenses. Dorchester acknowledges receipt of $1,240,463.51 (Document # 46 at 30) in refunded post production expenses but denies that it has been made whole.

[2]. Chesapeake states that "[t]here are no genuine issues of material fact with reference to Dorchester's asserted claims and Chesapeake is entitled to a judgment as a matter of law dismissing those claims." Document # 42 at 1. Yet Chesapeake never mentions Dorchester's fifth claim, which alleges that Chesapeake made no royalty payments at all on 20 wells.

chester seeks summary judgment in its favor on its claim that Chesapeake underpaid Dorchester's royalties under the six oil and gas leases and on its claim for an accounting.

## A. The Gas Royalty Clause

 Both parties agree that Arkansas law governs the six leases at issue here. Both parties contend that the lease is unambiguous, but they disagree as to its meaning. "When a contract is unambiguous, its construction is a question of law for [the] court." *Artman v. Hoy*, 370 Ark. 131, 136, 257 S.W.3d 864, 869 (2007). Arkansas courts "apply three well-established principles of contract law." *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012) (quoting *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992)). The first rule of interpreting a contract is to "ascertain and give effect to the intention of the parties." *Smith*, 664 F.3d at 1212 (quoting *Harris v. Stephens Prod. Co.*, 310 Ark. 67, 72, 832 S.W.2d 837, 840 (1992)). To determine the intention of the parties, Arkansas courts look to the contract as a whole and the circumstances surrounding its execution. *Griffin*, 310 Ark. at 170, 832 S.W.2d at 820. Second, in construing a contract, Arkansas courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning." *Id.* at 169, 832 S.W.2d at 819 (quoting *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Milburn*, 269 Ark. 384, 386, 601 S.W.2d 841, 842 (1980)). Third, "different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible." *Griffin*, 310 Ark. at 169–70, 832 S.W.2d at 819 (quoting *Cont'l Cas. Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652, 655 (1971)). "A construction that neutralizes any provision of a contract should never be adopted, if

the contract can be construed to give effect to all provisions." *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 686 (2004).

 "When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Artman*, 370 Ark. at 136–37, 257 S.W.3d at 869. "The initial determination of the existence of ambiguity rests with the court and, if the writing contains a term which is ambiguous, parol evidence is admissible and the meaning of the ambiguous term becomes a question of fact for the factfinder." *Griffin*, 310 Ark. at 169, 832 S.W.2d at 819. Nonetheless, "[t]o arrive at the intention of the parties to a contract, courts may acquaint themselves with the persons and circumstances and place themselves in the same situation as the parties who made the contract." *Stokes v. Roberts*, 289 Ark. 319, 323, 711 S.W.2d 757, 759 (1986). "Language in a contract is ambiguous when there is doubt or uncertainty as to its meaning or it is fairly susceptible of two interpretations." *Denton v. Pennington*, 82 Ark. App. 179, 183, 119 S.W.3d 519, 521 (2003).

 Dorchester and Chesapeake dispute the meaning of paragraph 3(b), which states:

(b) <u>Royalty on Gas</u>. On gas, including casinghead gas or other gaseous substances, produced and saved from the premises [other than for processing at a plant as described in Paragraph 3(d) hereof], Twenty–Five Percent (25.0%) of the proceeds received from any sale of such gas at the point of sale or delivery of the gas produced and saved. Any deduction for the expenses of production, gathering, dehydration, compression, transportation, (except non-affiliat-

ed transportation charges incurred on interstate pipelines regulated by the Federal Energy Regulatory Commission and/or pipelines whose transportation rates are regulated by the State of Arkansas. Said transportation charges will be limited to direct for amounts of Lessor's gas transported and Lessee will not be able to deduct charges for unutilized pipeline capacity), manufacturing, processing, treating or marketing of such gas shall be added to the price received by Lessee for such gas so that Lessor's royalty shall not be charged directly or indirectly with any such expenses. Provided, however, the proceeds from any such well shall always be equal to or greater than the proceeds received from sales in the field or prevailing area whichever is the greater, but not less than received by Lessee or any of its affiliates, exclusive of the above enumerated expenses except for those transportation charges incurred in a regulated pipeline system as set forth above.

Document # 1 at 7. The first sentence of this clause provides for royalties of 25% of the proceeds from any sale of gas. The second sentence prohibits Chesapeake from deducting expenses of production and transportation (except for transportation charges incurred on regulated pipelines) from the royalty payments. The third sentence states that the proceeds from any sale must always be equal to or greater than the proceeds received from sales in the field or prevailing area, whichever is greater, but not less than received by Chesapeake or its affiliates, excluding expenses other than transportation charges incurred in a regulated pipeline. The dispute primarily concerns the meaning of this third sentence.

Dorchester contends that the third sentence "was designed to ensure that Dorchester's and Chesapeake's interests were aligned by requiring Chesapeake to obtain the highest available price for its sales of gas, thus maximizing Dorchester's royalty payments." Document # 46 at 9. Dorchester argues that the third sentence defines "proceeds" and that the sentence's clear and unambiguous language mean that royalties must be based on the highest price in the field or prevailing area, whether received by Chesapeake or another party. *Id.* at 13.[3]

Further, Dorchester states that the term "field" means "the actual locality of the wells," which the Arkansas Oil and Gas Commission has defined in its Rule B–43 as the "Fayetteville Shale." *Id.* at 14. Dorchester next contends that the term "prevailing area" is "a reference to the locality of the 'point of sale or delivery,'" as used in the first sentence of the royalty clause. *Id.* Based on these interpretations, Dorchester states that "when Chesapeake sells the gas in the field, the price component of proceeds is based on the greater of the price received by Chesapeake or the highest price received in the field. However,

---

**3.** During oral argument, Dorchester restated its position by saying that the disputed language requires Chesapeake to sell gas at the "best price reasonably attainable," which as Dorchester argued, means that the disputed language merely incorporated within the lease what Texas recognizes as an implied covenant by an oil and gas lessee to market the product in good faith. *See Amoco Prod. Co. v. First Baptist Church of Pyote,* 579 S.W.2d 280, 285–87 (Tex. Civ. App. 1979). Arkansas arguably recognizes such an implied covenant to market. *Stirman v. Exxon Corp.,* 280 F.3d 554, 564 (5th Cir. 2002) (citing *Seeco, Inc. v. Hales,* 341 Ark. 673, 693, 22 S.W.3d 157, 170 (2000) ("We agree with the royalty owners' experts that SEECO's duty was to obtain the best price for itself and the lessors.")). Neither Dorchester's complaint nor its briefs invoked an implied covenant so Chesapeake has had no opportunity to brief the issue of whether it has an implied covenant to obtain the best price reasonably available. Consequently, the Court will not address that issue.

when Chesapeake sells the gas outside of the field, then the price component of proceeds is based on the greater of the price received by Chesapeake, the highest price received in the locality of the 'point of sale or delivery,' or the highest price in the field." *Id.* Because Chesapeake admittedly calculated the royalties based on a weighted average sales prices analysis and not on any "highest price," Dorchester argues that Chesapeake has breached the royalty clauses by underpaying Dorchester's royalties.

Chesapeake emphasizes that the royalty clause does not use the term "higher price." Chesapeake argues "that reading the entire Royalty Clause along with the Payment Clause provides that under the facts, Dorchester is only entitled to 25% of the proceeds received as a matter of law." Document # 43 at 5. Chesapeake states that "[t]he last sentence of the Royalty clause requires the payment of royalties based on 'proceeds' from 'sales' with the only issue being the location of such sales ('in the field or prevailing area')." *Id.* Chesapeake interprets the phrase "field or prevailing area" as one term, not two, referring to the geographic region where production occurs. Document # 57 at 20. Chesapeake contends that "the last sentence is included in the Royalty Clause as a protection against Chesapeake incurring and charging the lessor transportation expenses on interstate pipelines to obtain proceeds from sales downstream of the 'field or prevailing area' which result in lesser royalty than would have resulted from sales in the 'field or prevailing area.'" Document # 43 at 5.

Chesapeake argues that the last sentence of the royalty clause "does not have applicability here because in general the volumes of gas produced from the Fayetteville Shale Play are so extensive that there is no capacity 'in the field or prevailing area' to sell the significant volumes of gas produced from this Play and, therefore, the gas produced ... [is] sold at points on interstate pipelines downstream from the field or prevailing area." *Id.* at 6. Moreover, Chesapeake states that Dorchester's interpretation of the royalty clause "is also impracticable and, in many circumstances, impossible to apply as a royalty provision" because Chesapeake "does not have the information regarding the prices at which its competitors, the other working interest owners in the wells, sell gas." *Id.*

In summary, Dorchester construes the lease to provide for gas royalty payments of 25% of the highest price for which Chesapeake could have sold the gas, regardless of whether that was the price at which Chesapeake sold the gas, and regardless of whether that price could have been obtained in the field or somewhere down the pipeline. In contrast, Chesapeake construes the lease to provide for gas royalty payments of 25% of the proceeds of its actual sales, with the caveat that if it has the opportunity to sell the gas in the field at a price higher than the net price it could obtain by selling at some point down the pipeline, after deducting transportation costs, it must sell it in the field.

Central to the dispute is the meaning of the phrase "field or prevailing area." According to Dorchester, "field" refers to the locality where production occurs, whereas "prevailing area" refers to the point of sale. Chesapeake disagrees, contending that "field or prevailing area" is a single term in which "field" and "prevailing area" are more or less synonymous, as in the phrase "cardinal or red." The parties agree that the "field" is the Fayetteville Shale as defined by the Arkansas Oil and Gas Commission; they disagree on the meaning of "prevailing area." The lease does not define the term, nor does the evidence show that "prevailing area" is a term of art

commonly used in the oil and gas industry so that sophisticated parties, such as Dorchester and Chesapeake, would understand its meaning without the need for a definition in the contract. Chesapeake points to a provision in the Code of Federal Regulations that defines "area" as "a geographic region at least as large as the defined limits of an oil and/or gas field, in which the oil and/or gas lease products have similar quality, economic, and legal characteristics." 30 C.F.R. § 1206.151. As Chesapeake itself notes, that regulation is used with reference to federal mineral properties managed by the Bureau of Land Management, but the lands here are not managed by the Bureau of Land Management, nor is there any evidence that the parties' use of the term "prevailing area" was a reference to the provision in the Code of Federal Regulations.

The language in the clause at issue, by itself, does not resolve the parties' dispute regarding its meaning. As noted, Dorchester construes the third sentence of the clause to modify the first sentence of the clause so that, as modified, the first sentence provides that the royalty on gas should be 25% of the proceeds received from Chesapeake's sales or the highest price that could have been obtained. But Dorchester offers no explanation as to why a provision modifying the first sentence of the clause is not contained in, or does not immediately follow, the first sentence, nor does Dorchester explain why the first sentence provides that royalties will be based on proceeds from Chesapeake's sales, when in fact royalties will be based on the highest price that could have been obtained regardless of whether that is the price at which Chesapeake sold the gas. While Chesapeake's interpretation of the third sentence has the merit of construing the sentence to modify the sentence immediately preceding it, Chesapeake's interpretation also has difficulties.

On Chesapeake's interpretation, the "field or prevailing area" is one term, not two, but the construction of the sentence suggests otherwise. The sentence states that the proceeds "shall always be equal to or greater than the proceeds received from sales in the field or prevailing area whichever is greater[.]" If Chesapeake's interpretation is correct, the phrase "whichever is greater" is redundant because the sentence already provides that the proceeds "shall always be equal to or greater than the proceeds received from sales in the field[,]" while if the "field or prevailing area" refers to two localities, the phrase "whichever is greater" is not superfluous.

Nor does the larger context of the lease remove the ambiguity. Dorchester notes that paragraph 3(a) of the lease provides:

> (a) <u>Royalty On Oil</u>. On all oil (including any other liquid hydrocarbons) the sum of Twenty–Five Percent (25.0%) of the value of the gross production, said value to be the proceeds received by Lessee. Lessee may, from time to time, purchase any royalty oil (including any other liquid hydrocarbons) paying therefore, on the date it is to run to the pipeline or storage tanks, at the same proceeds received by Lessee for the sale thereof.

Document # 1 at 7. Dorchester points to this clause to show that the parties knew how to provide for royalty based solely on proceeds received by Chesapeake because they so provided in the provision relating to royalty on oil. Paragraph 3(b) differs from 3(a), so, Dorchester argues, its meaning must be different. But the parties also know how to use the term "point of sale" because they used that term in the first sentence of paragraph 3(b), so if that is what "prevailing area" means, why did not the parties simply say "point of sale"?

On the other hand, Chesapeake points to paragraph 3(h), which governs the timing of royalty payments:

(h) Payment of Royalty. Accounting and payment to Lessor of royalties from the first production of oil, liquid hydrocarbons, gas or respective constituent products as herein provided shall commence thirty (30) days following the receipt by Lessee of proceeds of any sale, or the use of such production, but no later than one hundred eighty (180) days after the date of first production, whichever is the earliest. Thereafter, unless otherwise specifically provided herein, all accountings and payments of royalties shall be made on or before the last day of the second calendar month following the calendar month in which such production occurred.

Document # 1 at 8. Chesapeake has submitted affidavits stating that if it is required to ascertain the highest price paid by any purchaser to any seller either in the field or somewhere along the pipeline during a given month, it must obtain that information from some place outside of its own records; and it is impossible to ascertain that information, make the necessary calculations, and make the royalty payments within the timeframe provided by this contractual provision. Dorchester has submitted no affidavits to the contrary. Nevertheless, Chesapeake has not explained why this difficulty would not also apply to its interpretation, which seems to require a comparison of the net price obtained on sales down the pipeline with the gross price available in the field.

Chesapeake interprets the last sentence in paragraph 3(b) as relating solely to the portion of the second sentence stating that Chesapeake is authorized to charge Dorchester for transportation costs on regulated pipelines, but paragraph 3(d), which provides for the royalty on residue gas resulting from plant operations, contains a provision subjecting those royalties to the last sentence of paragraph 3(b), even though nothing in paragraph 3(d) relates to transportation on regulated pipelines. The fact that paragraph 3(d) subjects royalty on residue gas resulting from plant operations to the third sentence in paragraph 3(b) suggests that, contrary to Chesapeake's argument, the third sentence of 3(b) is not merely a protection against the prospect that pipeline transportation costs might reduce the net price below the price that could be obtained in the field.

The late, great H. Franklin Waters once remarked, "[t]he use of imprecise royalty language ... in lease contracts leads to confusion and ambiguous interpretation by the parties." *Taylor v. Arkansas Louisiana Gas Co.*, 604 F.Supp. 779, 782 (W.D. Ark. 1985). Although Judge Waters made that remark in reference to market price royalty clauses, it is an apt comment on the royalty clause at issue here: it is imprecise, confusing, and ambiguous.

Both motions for summary judgment on this issue are denied. The issue of the interpretation of this provision will be submitted to the finder of fact at trial.

**B. Damages For Underpayment Of Royalty Claim**

Regardless of the interpretation of the royalty clause, Chesapeake argues that Dorchester's claim for underpayment of royalties "should be dismissed because Dorchester cannot meet its burden of proof." Document # 43 at 8. Chesapeake contends that "Dorchester has no way of knowing the 'highest price' received by any working interest owner for their production from the subject wells in any production month." *Id.* In support of this argument, Chesapeake attempts to discredit Dorchester's expert damage report by showing that the report is based on data

that is not available to Chesapeake and on sales that are not comparable to Chesapeake's sales.

In response, Dorchester contends that its expert damage report analyzed actual comparable sales data. Document # 50 at 6. Moreover, Dorchester argues that it need not prove what *the* highest price in the field or prevailing area was, just that a price higher than the price Chesapeake used to calculate Dorchester's royalties was in fact paid. *Id.* Dorchester also points to its claim for an accounting and its pending motion to compel as making summary judgment improper on the underpayment of royalty claim.

As noted elsewhere in this opinion, Dorchester's motion to compel is granted, so additional discovery will ensue. Because Dorchester has not had access to the documents on which royalty payments were based, the Court cannot say that no genuine dispute of material fact exists regarding Dorchester's damages for its claim of underpayment of royalties. Accordingly, the Court denies Chesapeake's motion for summary judgment on Dorchester's claim for underpayment of royalties.

## C. Claim For 12% Interest

Dorchester's second cause of action alleges that Chesapeake has failed to pay royalties within 180 days of commencement of production in violation of Ark. Code Ann § 15–74–604. Chesapeake moves for summary judgment on this claim, arguing that its leases with Dorchester contain an interest provision that differs from and replaces the interest provision in the statute. In contrast, Dorchester argues that the interest provision in the lease supplements, rather than supersedes, § 15–74–604.

Paragraph 3(h) of the lease provides:

[A]ll accountings and payments of royalties shall be made on or before the last day of the second calendar month following the calendar month in which such production occurred. . . . [I]f royalties are not paid to Lessor within the time period specified, Lessee shall pay to Lessor interest at ten percent (10%) per annum for each day overdue to a maximum of one hundred, twenty (120) days.

Document # 1 at 8. In pertinent part, § 15–74–604 states:

(b) In the event the operator under an oil or gas lease fails to pay oil or gas royalties to the mineral owner or his or her assignee within one hundred eighty (180) days after oil or gas produced under the lease is marketed, the unpaid royalties shall bear interest thereafter at the rate of twelve percent (12%) per annum until paid.

Ark. Code Ann. § 15–74–604.

Chesapeake argues that § 15–74–601(e) "allows the topic of interest to be controlled by the subject Lease if the Lease contains an applicable provision." Document # 43 at 9–10. Section 15–74–601(e) states:

(e) When payment has not been made within the time limits specified in this subchapter, the first purchaser shall pay interest to those legally entitled to the withheld proceeds commencing on the payment due date at the rate of twelve percent (12%) per annum on the nonpaid amounts unless a different rate of interest is specified in a written agreement between the payor and the payee.

Ark. Code Ann. § 15–74–601. Dorchester argues that § 15–74–601(e) does not apply here because § 15–74–601 deals with payments of proceeds by the "first purchaser," which means "the first commercial purchaser after completion of the well . . . ." Ark. Code Ann. § 15–74–601(c). According to Dorchester, § 601(e) applies to sales by

the operator, not to royalties owed by the operator on those sales.

 Regardless of whether § 601(e) applies here, the payment of royalty clause does not conflict with § 604(b). By its terms, the payment of royalty clause imposes a 10% interest rate for 120 days, a period that begins running two months (or approximately 60 days) after the date of production. Section 604(b), on the other hand, imposes a 12% interest rate if a lessee fails to pay royalties within 180 days after the date of production. Therefore, the payment of royalty clause provides a contractual interest rate for days that Chesapeake has failed to pay royalties prior to the 180 day trigger in § 604. Accordingly, the Court denies Chesapeake's motion for summary judgment on Dorchester's claim for 12% interest.

**D. Claim For 14% Penalty**

 Chesapeake next moves for summary judgment on Dorchester's third claim, which alleges that Chesapeake willfully withheld payment of royalties without just cause or through bad faith in violation of Arkansas Code Annotated § 15–74–602. Chesapeake argues that Dorchester did not make a proper notice or demand under Arkansas Code Annotated § 15–74–603(b) and that "[t]here is no alleged proof of willful withholding of payment of royalties without just cause or through bad faith." Document # 43 at 10.

Dorchester provides evidence of emails and letters that it claims constitute proper written notice to Chesapeake of Chesapeake's failure to make timely payment of royalties. Dorchester also argues that other lawsuits against Chesapeake, including cases in which Chesapeake has been found liable or settled, evidence Chesapeake's willful withholding of royalties in this case. Dorchester asserts that some of those cases involved royalty clauses that are sim-

ilar to the one at issue here, indicating that Chesapeake was familiar with the type of royalty provision disputed in this case.

Dorchester has demonstrated the existence of a genuine dispute of material fact. Accordingly, the Court denies Chesapeake's motion for summary judgment on Dorchester's claim to impose a 14% penalty on Chesapeake.

**E. Claim For Post Production Expenses**

Chesapeake next moves for summary judgment on Dorchester's claim that Chesapeake improperly deducted post production expenses from its royalty payments. Chesapeake contends that, since the filing of this suit, it has refunded the post-production expenses. Still, Dorchester states that "a factual issue remains as to whether Chesapeake has actually refunded *all* of its improper deductions." Document # 50 at 10. Dorchester argues that the "self-serving affidavit of Chesapeake's Assistant Controller of Accounting, April Smith," is insufficient evidence to meet Chesapeake's burden of proof for its affirmative defenses of performance. *Id.* at 11.

Discovery is not complete. Smith's affidavit, standing alone, is insufficient to meet Chesapeake's burden of showing that no genuine dispute of material fact exists because Dorchester has not had access to the records from which Smith's affidavit could be verified. Therefore, the Court denies Chesapeake's motion for summary judgment on this claim.

**F. Claim For An Accounting**

Dorchester alleges that the data from which the calculation of the amounts owed by Chesapeake is exclusively within the control of Chesapeake. Document # 1 at 5. Dorchester asserts that it is entitled to an accounting from Chesapeake regarding

each cause of action. Both parties move for summary judgment on this claim. Chesapeake states that it has provided Dorchester with an accounting. Dorchester asserts that Chesapeake has refused to produce documents supporting its royalty payment calculations and that Chesapeake's claimed accounting "merely restated the information provided on Chesapeake's royalty payment check stubs." Document # 46 at 30. Dorchester alleges that the accounting spreadsheet provided by Chesapeake "did not provide documents supporting the stated sales volumes, sales prices, expenses (where deductible), or taxes, as would customarily be provided in an oil and gas royalty accounting." *Id.*

 "An accounting is an equitable remedy designed to provide a means for compelling one, who because of a confidential or trust relationship has been entrusted with property of another, to render an account of his actions and for the recovery of any balance found to be due." *A & P's Hole–In–One, Inc. v. Moskop*, 38 Ark. App. 234, 239, 832 S.W.2d 860, 863 (1992). The burden of proof rests upon the party asked to account for its actions. *Walters–Southland Inst. v. Walker*, 217 Ark. 602, 609, 232 S.W.2d 448, 452 (1950); *see also A & P's Hole–In–One*, 38 Ark. App. at 240, 832 S.W.2d at 863 ("[T]he burden of proving that the accounts had been properly handled should have been placed on the fiduciary rather than the [plaintiff]."). "The degree of difficulty in preparing a fiduciary account should not foreclose the need of it in an appropriate case." *A & P's Hole–In–One*, 38 Ark. App. at 240–41, 832 S.W.2d at 864. If a defendant "does not have the proper records, then every presumption must be taken adversely to [it]." *Id.* "[W]hether a confidential relationship exists is a question of fact for the trier of fact to decide." *SEECO, Inc. v. Hales*, 341 Ark. 673, 698, 22 S.W.3d 157, 172–73 (2000)

(affirming a verdict finding that a producer owes a fiduciary duty to its royalty owners).

Chesapeake has not disputed that it maintains a fiduciary relationship with Dorchester. Instead, Chesapeake argues that it has met its burden of producing an accounting by providing "a spreadsheet produced in native format showing, on a well basis, the production volumes, sales prices, expenses, and taxes used to compute Dorchester's royalties." Document # 57 at 28. Chesapeake also states that its production of an audit report based on a sample of 20 wells for an eight-month period is a sufficient accounting. But Chesapeake has not supported its motion with the documents showing that it has met its burden of production.

 Chesapeake's reliance on spreadsheets reflecting its calculations of royalties based on weighted average sales prices is insufficient. Before it can be determined whether Chesapeake has properly handled the accounts and paid Dorchester properly under the leases, Chesapeake must produce documentation of the basis for its calculations of royalty payments to Dorchester. Chesapeake has not demonstrated to the Court that it has produced such an accounting to Dorchester.

Accordingly, Chesapeake's motion for summary judgment on Dorchester's claim for an accounting is denied. Because the records that Dorchester needs will be produced in response to Dorchester's discovery requests, Dorchester's motion for partial summary judgment as to its claim for an accounting is denied.

### III. Dorchester's Motion To Compel

In June 2013, Dorchester served written discovery on Chesapeake to which Chesapeake responded in July 2013. In pertinent part, Dorchester requested the following:

**REQUEST FOR PRODUCTION NO. 2:** Produce all documents that refer or relate to the gathering and/or transportation of hydrocarbons from the well-head of each of the Wells to the point of the first sale of such hydrocarbons to an unaffiliated third part pursuant to an arms-length transaction.

**REQUEST FOR PRODUCTION NO. 3:** With respect to each payment of royalty made to Dorchester for the production of hydrocarbons from the Wells, produce all documents that reflect how the price for each such hydrocarbon product was determined or computed.

**REQUEST FOR PRODUCTION NO. 4:** With respect to each payment of royalty made to Dorchester for the production of hydrocarbons from the Wells, produce all documents that reflect how the royalty paid to Dorchester for each such hydrocarbon product was determined or computed.

**REQUEST FOR PRODUCTION NO. 6:** Produce an electronic, machine-readable copy of Chesapeake's electronic database used to calculate Chesapeake's Weighted Average Sales Price "WASP" with respect to the production of hydrocarbons produced from the Wells for the period beginning with the date of first production from each such well through and including February 28, 2012.

**REQUEST FOR PRODUCTION NO. 8:** Produce all data utilized by Chesapeake to calculate Dorchester's royalty payments under the Leases.

Document # 27 at 3–4.

After receiving these requests, counsel for Chesapeake asked counsel for Dorchester if he would consider sample months. Document # 34 at 15. Eventually, Dorchester and Chesapeake agreed that Chesapeake would provide Dorchester information on how Chesapeake calculated royalties for 20 of the 347 wells and for eight of the 60 months in dispute. Document # 34 at 12–14. Dorchester agreed to the sample-set discovery "without waving [Dorchester's] right to all the [Weighted Average Sales Prices] data." *Id.* at 13.

Dorchester says that it "believed that it was implicit in Chesapeake's position [regarding the sample-set discovery] that Chesapeake agreed that it had in fact underpaid Dorchester's royalties, but that Chesapeake wanted Dorchester to compute the amount of that underpayment by using Chesapeake's 20-well, eight-month summary and then extrapolate that result to find the total of Chesapeake's under payment of royalty damages." *Id.* at 5. Upon receiving Chesapeake's three rebuttal expert disclosures, Dorchester says that it realized that Chesapeake disputed the meaning of paragraph 3(b) of each lease and therefore "renew[ed] its request that Chesapeake produce all of the documents responsive to Dorchester's Requests for Production Nos. 2, 3, 4, 6, and 8." Document # 30–1 at 3.

During oral argument, Chesapeake stated that much of its objection to the renewed discovery requests at issue related to their timing; they were renewed at or near the end of the discovery period previously set in a scheduling order. Chesapeake conceded that if the Court were to set aside the previous scheduling order and reopen discovery, much of its objection to these discovery requests would be rendered moot. Because Dorchester entered into an agreement to accept a summary using sales from twenty wells over a period of eight months on the assumption that Chesapeake concurred in its interpretation of the gas royalty provision, and because Dorchester reserved its right to request full compliance with its discovery requests, the most reasonable course of action is to set aside the previous scheduling order and permit discovery to be reopened.

Chesapeake's objections to the discovery requests based on their timing is overruled.

In its brief Chesapeake asserted that the information Dorchester requests is not relevant to Dorchester's claims or Chesapeake's defenses except to the extent that Chesapeake has already provided information. Document #30 at 1. Chesapeake states that the information is not relevant in part because its "manner of paying royalties is not disputed." *Id.* Furthermore, Chesapeake states that the information "is not reasonably accessible because of undue burden and cost" and is "unreasonably cumulative and duplicative of information already produced by Chesapeake pursuant to agreement with Dorchester." *Id.* Chesapeake also states that it "does not possess all of the requested documents because Chesapeake sold and assigned 25% of the subject leases to BP America Production Company ("BP") in 2008 and sold and assigned it remaining interests in the subject leases to BHP Billiton Petroleum (Fayetteville) LLC ("BHP") in 2011." *Id.* at 2.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." The rule "is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Relevant information includes "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351,

98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978)). Although "relevancy is broadly construed," *id.* district courts have "particularly broad" discretion in discovery matters. *Gov't of Ghana v. ProEnergy Services, LLC*, 677 F.3d 340, 343–45 (8th Cir. 2012). Under Rule 34, a party may request any other party to produce documents, electronically stored information, or tangible things that are in the responding party's "possession, custody, or control" and are "within the scope of Rule 26(b)." Fed. R. Civ. P. 34.

## A. Request For Production No. 2

Request for production No. 2 asks Chesapeake to "[p]roduce all documents that refer or relate to the gathering and/or transportation of hydrocarbons from the wellhead of each of the Wells to the point of the first sale of such hydrocarbons to an unaffiliated third part pursuant to an arms-length transaction." Document #27 at 3. Chesapeake objected to this request because it is overly broad and burdensome. *Id.* Nonetheless, Chesapeake "produce[d] a sample set for an eight month period covering twenty wells pursuant to the agreement by the parties." *Id.* In its response to Dorchester's motion to compel, Chesapeake states that it "has refunded all the gathering and transportation cost [sic] it erroneously deducted for all wells it remitted payment on, thus making gathering contracts or transportation fees moot and irrelevant." Document #31 at 5. Chesapeake also asserts that it has produced marketing agreements with Chesapeake Energy Marketing, Inc., and says that it will disclose a description of gathering systems. *Id.*

It appears that the parties dispute the relevancy of documents pertaining to "gathering contracts or transportation fees." These documents are relevant and discoverable. First, the gathering contracts

and transportation fees for all 347 wells is relevant to resolving Dorchester's claim for such post-production expenses. Second, Chesapeake's contention that it has refunded its erroneously deducted gathering and transportation costs does not resolve Dorchester's need to determine whether Chesapeake complied with the royalty clause's requirement, as Dorchester interprets it, to pay the highest price between that received by Chesapeake or by third parties in the field or prevailing area. The volumes of the sold gas and the locations of such sales are relevant to determining whether and the extent to which Chesapeake complied with the royalty clause, as well as Dorchester's claim for damages.

As to Chesapeake's contention that it assigned its interests in the leases to BP and BHP and that therefore it does not possess all requested documents, the extent to which Chesapeake possesses the documents sought in request for production No. 2 is unclear. Dorchester has made no showing that Chesapeake possesses or controls any documents or data pertaining to BP or BHP's sales of gas. The Court grants Dorchester's motion to compel the items sought in request for production No. 2 to the extent that Chesapeake maintains possession, custody or control over such items.

## B. Request For Production No. 3

Request for production No. 3 provides: "With respect to each payment of royalty made to Dorchester for the production of hydrocarbons from the Wells, produce all documents that reflect how the price for each such hydrocarbon product was determined or computed." Document # 27 at 3. Chesapeake objected that the request was overly broad and burdensome. *Id.* Chesapeake agreed with Dorchester to provide a sample set for an eight month period covering twenty wells. Chesapeake asserts

that its sample set "specifically reflected that the price paid to Dorchester for a specific month was determined based on a weighted average sales price." Document # 31 at 5. Chesapeake also states that the sample set included all the prices that were used in the weighted average, the point of sale, sales price, and the volumes sold and that since Chesapeake produced the price for each month for all 347 wells in which it had data, the sample set suffices as a simple explanation of the methodology it used for all wells. Therefore, Chesapeake states that requiring it to produce a set for all months and wells would be redundant. *Id.*

Dorchester's claim is that Chesapeake failed to pay royalties according to the "highest price" requirement in the royalty clause. Chesapeake admits that it paid the royalties based on weighted average sales price. The documents used to calculate the weighted average sales prices must also reflect the proceeds that Chesapeake received from selling gas from Dorchester's wells. Dorchester seeks the documents showing the prices, locations of sales, and the volumes sold. The documents that Dorchester seeks are relevant to its claims that Chesapeake did not base its royalty payments on the highest price it received or that was received in the field or prevailing area.

Again, it is unclear the extent to which Chesapeake possesses the requested discovery. Dorchester has made no showing that Chesapeake possesses or controls any documents or data pertaining to BP or BHP's sales of gas. The Court grants Dorchester's motion to compel the items sought in request for production No. 3 to the extent that Chesapeake maintains possession, custody or control over such items.

## C. Request For Production No. 4

Request· for production No. 4 states: "With respect to each payment of royalty made to Dorchester for the production of hydrocarbons from the Wells, produce all documents that reflect how the royalty paid to Dorchester for each such hydrocarbon product was determined or computed." Document # 27 at 3. Chesapeake objected to this request as overly broad and burdensome and produced a sample set for an eight month period covering twenty wells pursuant to its agreement with Dorchester. Chesapeake states that it produced a spreadsheet containing "all of this information for all 347 Dorchester wells in which it had the information." Document # 31 at 5. Chesapeake also states that it "does not have the information in its possession once BHP or BP took over." *Id.*

Chesapeake has provided its methodology for determining its royalty payments and a spreadsheet that apparently indicates how it was applied to all 347 wells for which Chesapeake has the information. Because Dorchester knows the amounts it received in royalties and because the Court has granted its motion to compel as to documents Chesapeake used to compute its prices for sales of gas, Dorchester will have sufficient information to determine how all of Chesapeake's royalty payments were calculated. Therefore, the Court denies Dorchester's motion to compel as to request for production No. 4.

## D. Request For Production No. 6

In request for production No. 6, Dorchester asks Chesapeake to "[p]roduce an electronic, machine-readable copy of Chesapeake's electronic database used to calculate Chesapeake's Weighted Average Sales Price "WASP" with respect to the production of hydrocarbons produced from the Wells for the period beginning with the date of first production from each such

well through and including February 28, 2012." Document # 27 at 4. Chesapeake objected to this request as vague, overly broad and burdensome but produced a sample set for an eight month period covering twenty wells pursuant to its agreement with Dorchester. Chesapeake now states that it is unclear what Dorchester is requesting by referring to "databases." Document # 31 at 6.

Chesapeake has already agreed to provide a sample set of information regarding this request for production and, therefore, should fully understand what items Dorchester seeks. Furthermore, this information is relevant to Dorchester's claims for the same reasons that the information sought in request for production No. 3 is relevant to those claims. Therefore, the Court grants Dorchester's motion to compel the items sought in request for production No. 6 to the extent that Chesapeake maintains possession, custody or control over such items.

## E. Request For Production No. 8

Request for production No. 8 asks Chesapeake to "[p]roduce all data utilized by Chesapeake to calculate Dorchester's royalty payments under the Leases." Document # 27 at 4. Chesapeake objected to this request as vague, overly broad, and burdensome. *Id.* Chesapeake also stated that it "refunded any deducts, provided backup calculations and has agreed to produce a sample set for an eight month period covering twenty wells pursuant to the agreement by the parties." *Id.* In its response to Dorchester's motion to compel, Chesapeake states that it "produced spreadsheets . . . covering all 347 wells in which Chesapeake had the information in its possession." Document # 31 at 6.

It is unclear whether Chesapeake's produced spreadsheets satisfy Dorchester's request. In its reply Dorchester did not

dispute Chesapeake's statement that it had produced these spreadsheets covering all 347 wells. The Court grants Dorchester's motion to compel as to request for production No. 8 to the extent that Chesapeake is in possession, custody, or control of additional data used to calculate its royalty payments to Dorchester. Otherwise, the Court denies Dorchester's motion to compel as to request for production No. 8.

## CONCLUSION

For the reasons stated, the both parties' motions for summary judgment are denied. Documents # 42 and # 45. Dorchester's motion to compel is granted in part and denied in part. Document # 26.

As the Court and the parties discussed during oral argument, the most efficient way to proceed with the trial in this case will be to bifurcate the issue of the interpretation of paragraph 3(b) of the lease and try that issue separately before trying the remainder of the issues. The Court will also consider whether to appoint a special master or court-appointed expert to examine the accounting records regarding the gas payments at issue. The Court orders the parties to submit a joint report within thirty days from the entry of this Opinion and Order covering the items that would be covered in a Rule 26 report insofar as they are applicable to the current stage of this proceeding. After consultation with the courtroom deputy, Mr. Wilkins, the parties should propose a date for the first phase of the trial, i.e., the phase pertaining to the interpretation of paragraph 3(b) of the lease, a date for the second phase of the trial, and discovery cutoff dates and deadlines for expert reports for both phases of the trial. The parties should not postpone discovery pertaining to the second phase of the trial but should commence that discovery immediately so that this case can be brought to a conclusion as expeditiously as possible. If the parties stipulate that either or both phases of the trial should be tried to the Court, notwithstanding the previous request for a jury trial, the joint report should so state. If the parties do not so stipulate, nothing needs to be said regarding which party declines to waive a jury trial. If the parties can agree that a special master or court-appointed expert should be appointed for some or all of the issues in the case, the joint report should so state; and, if the parties agree that a special master or court-appointed expert should be appointed, the report should state whether the parties agree as to whom should be appointed in that capacity, providing a name and contact information if they do agree.

IT IS SO ORDERED this 18th day of May, 2015.